## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **ROUTES 202 AND 309 NOVELTIES AND GIFTS, INC.** | : | **CIVIL ACTION NO. 11-CV-5822** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE KINGS MEN, ET AL.,** | : | |
| | : | |
| **Defendants** | : | |
| | : | |

### MEMORANDUM

**Tucker, J.**                                                    **October _4_, 2011**

Presently before the Court is Plaintiff's Motion for Temporary Restraining Order and Permanent Injunction (Doc.2), Defendants' Response in Opposition thereto (Doc. 10), and all related exhibits and documents. For the reasons set forth below, and upon consideration of the parties' submissions and oral argument held before this Court on September 22, 2011, this Court will deny Plaintiff's Motion for Temporary Restraining Order and Permanent Injunction.

**I.**                    **BACKGROUND AND FINDINGS OF FACT**

The present matter arises out of allegations brought by Plaintiff Routes 202 and 309 Novelties and Gifts ("Plaintiff") against Defendants The Kings Men, Mark Houck, Damian Wargo, David DiNuzzo, Sr., Desarae McDonnell, Robert Lechter, Charles John Harvey, Phillip Greco, John A. McGann, III, and John Does 1-100. ("Defendants"). The allegations submitted by Plaintiff include: 1) trespass; 2) public nuisance; 3) private nuisance; 4) violation/suppression

1

of free speech; 5) violation of the Sherman Act; and 6) violations of the Racketeer Influenced and Corrupt Organization Act and Hobbs Act. Plaintiff requests that this Court enter an order enjoining Defendants from protesting at the Plaintiff's business location. Plaintiff also requests redress for Defendants' alleged infringement of Plaintiff's free speech rights and commercial expression, Defendants' trespass on Plaintiff's property, and Defendants' illegal coercion and infringement on Plaintiff's rights to conduct its business. Lastly, Plaintiff requests punitive damages, reasonable attorneys fees, expenses and costs, and further relief as the Court may deem just and equitable.

Plaintiff, a Pennsylvania limited liability company, is engaged in the business of providing adult novelties under the trade name of "Adult World." (Compl. ¶ 1.) Adult World is located at 608 Upper State Road, Montgomeryville, Pennsylvania. (TRO Hearing Transcript 10:23-25; 11:15-17.) Defendant The Kings Men ("TKM") is a Pennsylvania nonprofit corporation with a business address located in Oreland, Pennsylvania. (Compl. ¶ 2.) Defendant Mark Houck ("Houck"), a Pennsylvania resident, is the President of TKM. (Compl. ¶ 3.) Defendant Damian Wargo ("Wargo"), a Pennsylvania resident, is the Director of Operations of TKM. (Compl. ¶ 4.) Defendant David DiNuzzo, Sr. ("DiNuzzo"), a Pennsylvania resident, is the Director of Programming of TKM. (Compl. ¶ 5.) Defendants Desarae McDonnell, John R. McGann, III, Robert Lechter, and Charles Harvey, all Pennsylvania residents, were alleged participants in a protest staged by TKM at Adult Word on August 3, 2011 (Compl. ¶¶ 6-10.) Defendants John Does 1-100 are unidentified persons who allegedly participated in a protest staged by TKM at Adult Word on September 14, 2011 (Compl. ¶ 11.)

TKM, a Roman Catholic fraternal organization, is aimed at developing men to be

2

"leaders, protectors, and providers" through both education and action. (Compl. ¶¶ 17, 19.) The efforts of the group are organized around the following three issues, termed as "noble battles" on TKM's internet site: 1) abortion; 2) "pornography"; and 3) the defense of traditional marriage. (Compl. ¶¶ 20-21.) More specifically, TKM expends considerable energy in an effort to eliminate pornography, as the organization believes that pornographic materials contribute to the decline of the family and moral decay. (Compl. ¶¶ 22, 24.)   The organization views sexually explicit material as the root cause of adultery, fornication, rape, incest, the contraceptive mentality, divorce, and abortion. (Compl. ¶ 26.) To propel their efforts to eliminate pornography, TKM created a "No More Porn Tour", with dates listed on its internet sites for future organized protests at adult based business locations, including Adult World. (Compl. ¶¶ 23, 28.)

TKM, directed and led by Houck, Wargo and DiNuzzo, has solicited and organized individuals to protest at adult businesses, and has staged such protests, with the intention of closing adult entertainment enterprises. (Compl. ¶¶ 29, 31, 33.) The TKM internet site boasts the impact of TKM's protests, which to date, have led to the closure of six adult businesses. (Compl. ¶¶ 36, 37) (TRO Hearing Transcript 94:17-25.) Defendant Houck stated that TKM has protested at Adult World over eighty times over the past five years. Over the past sixteen months, Houck stated that TKM has staged regular protests at the store's location on the first Wednesday of each month. (TRO Hearing Transcript 82:14-25; 83:1-2.)

On August 3, 2011, Defendants and unidentified individuals traveled to the property of Adult World, and protested in front of and on the side of Plaintiff's two story building. (Compl. ¶¶ 42, 43, 45.) Between Plaintiff's building and the curb line for Upper State Road, there is a macadam-coated parking lot. There exists no sidewalk along Plaintiff's property line abutting

3

Upper State Road.  There is, however, a right of way located within Upper State Road, and not on Plaintiff's property.  (Compl. ¶ 49.) This right of way consists of a decorative, mulched floral area.

During their protest, Defendants called out verbally to customers and employees, in an attempt to dissuade them from doing business with Plaintiff, and to proselytize their beliefs. (Compl. ¶ 54.)  Defendants were advised by Plaintiff's manager, Mr. Harris, that Defendants were unwelcome on Plaintiff's property, however, Defendants refused to leave the premises. (Compl. ¶¶ 53, 56.)  Mr. Harris called the Montgomery Township Police to complain about Defendants' refusal to leave Plaintiff's property.  When a policeman arrived at Adult World in response to Mr. Harris' call, the policeman instructed Defendants to leave the side area of Plaintiff's building and confine their protesting activities to the mulched area in front of Adult World, between the two driveways of Plaintiff's parking lot.  Defendants complied with these orders and moved their protest to the mulched area.  (Compl. ¶ 60.)  Plaintiff was informed by the Montgomery Township Police that Defendants were not allowed to remain on the sides of Plaintiff's building. According to the police, Defendants did, however, have the right to remain on the mulched area, which constituted a "right of way." Accordingly, Defendants moved their protest to the mulched area.  (Compl. ¶¶ 58, 59.)

Additionally, one of TKM's leaders spoke with the news media at the August 3, 2011 protest, and made allegations that illegal activities were occurring on the premises of Adult World.  (Compl. ¶¶ 67, 68.)  Lastly, during the same protest, Defendant Houck reported that TKM buried "miraculous medals" in the mulch in front of Adult World. (TRO Hearing Transcript 155:3-21.)

4

On September 14, 2011 at 4:00 p.m., TKM protested at Adult World once again. Initially, TKM's internet site advertised that a protest would be staged by the organization at Adult World on September 7, 2011. At the September 14, 2011 protest, Plaintiff once again contacted the Montgomery Township Police to request assistance. When police arrived, they instructed Defendants Houck and DiNuzzo, and other unidentified protestors that they must stop obstructing the means of ingress and egress to Adult World. Defendant Houck admits that at this protest, TKM protestors blocked the sight line of an exiting motorist such that the motorist was forced to back up due to an inability to see oncoming traffic on Upper State Road. (TRO Transcript 152:4-12.) Plaintiff again called the Montgomery Township Police, and the police appeared again, ordering Defendants to cease the actions of obstructing the view of motorists on Upper State Road. (Compl. ¶¶ 77-81.)

According to Plaintiff, Defendants have infringed upon Plaintiff's free speech and commercial expression rights by conducting unduly intrusive protests that have impeded Plaintiff's ability to carry on its business, thus causing Plaintiff to suffer irreparable damage. (Compl. ¶¶ 16-17.) Plaintiff alleges that Defendants' "illegal coercion and infringment on the rights of Plaintiff to conduct its business" was in violation of "the Sherman Act, common law trespass, public nuisance and private nuisance." (Compl. ¶ 15.)

Accordingly, Plaintiff seeks a temporary restraining order and permanent injunction to enjoin Defendants from continuing their alleged violations. Plaintiff contends that such relief is necessary to protects its ability to freely run its business and exercise its freedom of speech rights to sell adult products. (Compl. ¶ 14.) Additionally, at oral argument, Plaintiff proposed a time, place, and manner restriction on Defendants' protest activities at Adult World, as a possible way

5

to obtain Plaintiff's desired relief.  (TRO Hearing Transcript 7:25; 8:1-5.)

## II.                    PROCEDURAL BACKGROUND

On September 15, 2011, Plaintiff filed both its Complaint (Doc. 1) and Motion for

Temporary Restraining Order and Permanent Injunction (Doc. 2.)  The Court issued an initial

Order on September 16, 2011, declining Plaintiff's request to issue an immediate temporary

restraining order prior to the Court's scheduling of a hearing where both parties could be heard.

The Court held a hearing on the Plaintiff's application for temporary restraining order and

injunction on September 22, 2011.

## III.                      LEGAL STANDARD

"[T]he grant of injunctive relief is an 'extraordinary remedy which should be granted only

in limited circumstances.'"AT&T v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1426-27

(3d Cir. 1994); see also Instant Air Freight Co. v. C. F. Air Freight, Inc., 882 F.2d 797, 800 (3d

Cir. 1989) (citing Frank's GMC Truck Ctr, Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir.

1988).  Generally, in determining whether to grant a preliminary injunction or a temporary

restraining order, courts in this Circuit review four factors: (1) the likelihood that the applicant

will prevail on the merits at the final hearing; (2) the extent to which the plaintiffs are being

irreparably harmed by the conduct complained of; (3) the extent to which the defendants will

suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.  Shire

US, Inc. v. Barr Labs. Inc., 329 F.3d 348, 352 (3d Cir. 2003) (citations omitted).  "[W]hile the

burden rests upon the moving party to make [the first] two requisite showings, the district court

'should take into account, when they are relevant, (3) the possibility of harm to other interested

persons from the grant or denial of the injunction, and (4) the public interest.'" Acierno v. New

6

Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (citation omitted); see also Adams v. Freedom Forge Corp., 204 F.3d 475, 484 (3d Cir. 2000) (noting that "[i]f relevant, the court should also examine the likelihood of irreparable harm to the nonmoving party and whether the injunction serves the public interest.") All four factors should favor relief before an injunction will be issued. S & R Corp. v. Jiffy Lube Int'l. Inc., 968 F.2d 371, 374, (3d Cir. 1992)(citing Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 192 (3d Cir. 1990)). When a movant seeks a preliminary injunction that is directed at not merely preserving the status quo but at providing mandatory relief, the burden on the moving party is "particularly heavy." Punnett v. Carter, 621 F.2d 578, 582 (3d Cir. 1980)."

In order to prove irreparable harm, the moving party "must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" Acierno, 40 F.3d at 653 (quoting Instant Air Freight Co., 882 F.2d at 801). "The word 'irreparable' connotes that which cannot be repaired, retrieved, put down again, atoned for." Id. (citations omitted). In addition, the claimed injury cannot merely be possible, speculative or remote. [M]ore than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat; [an injunction] may not he used simply to eliminate a possibility of a remote future injury...'" Id. at 655 (citations omitted).

## III.                                    CONCLUSIONS OF LAW

### DISCUSSION

Courts will issue a preliminary injunction only where the following four factors weigh in favor of this extraordinary measure: (1) the likelihood that the applicant will prevail on the merits

7

at the final hearing; (2) the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; (3) the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. However, before reaching factors three and four, the moving party must first satisfy its burden with respect to factors one and two. Adams, 204 F.3d at 484. If a plaintiff fails to satisfy this burden, this is the end of the inquiry, and a preliminary injunction will not be issued.

## A.   Likelihood of Success on the Merits

The first factor of the preliminary injunction analysis is the likelihood of success on the merits. Here, Plaintiff presents six claims: (1) trespass; (2) public nuisance; (3) private nuisance; (4) violation/suppression of free speech; (5) violation of the Sherman Act; and (6) violations of the Racketeer Influenced and Corrupt Organization Act and Hobbs Act. As discussed below, it is clear that Plaintiff has failed to satisfy its burden of demonstrating a likelihood of success on the merits with regard to all six claims.

### i. Trespass

Plaintiff argues that it is likely to succeed on the merits of its first claim because Defendants, during their protests at Adult World, have trespassed by congregating on the mulched area in front of Adult World. In support of its position, Plaintiff submits that the mulched area, despite being a Township right of way as notated on the Adult World site plan, has not been exercised by the Township, and thus, should not be considered a public sidewalk where protests are permissible. (TRO Hearing Transcript 3:7-20); (Pl. Proposed Findings of Fact and

8

Conclusions of Law, ¶¶ 98-99.)[1]

Defendants counter that Plaintiff would not likely succeed on the merits concerning its claim of trespass, as Defendants do not seek to protest on property to which Plaintiff has exclusive use or possession. To the contrary, Defendants state that they desire to stand on what they contend is a right of way (consisting of the mulched area in front of Adult World), and on the neighboring property which Defendants contend is owned by Lukoil. Furthermore, Defendants accurately point out that Plaintiff admits that the mulched area is technically a Township right of way. (TRO Hearing Transcript 3:7-20.)

Under Pennsylvania law, an action for trespass is valid only where the plaintiff has the exclusive right of use and possession of the land in question. See Northeast Women's Center, Inc. v. McMonagle, 670 F. Supp. 1300, 1311, (3d Cir. 1987); Kopka v. Bell Telephone Co., 371 Pa. 444, 91 A.2d 232, 235 (1952). An individual who intentionally enters the land of another without permission is just as liable as one who does not physically trespass on land possessed by another, yet directs another person to do so. Kopka at 235 (quoting Restatement (First) of Torts § 164 (1934)).

In examining the issue of whether property is public or privately possessed, the Third Circuit has deemed a right of way in question to be a public forum because it was adjacent to a street, which is a public forum. Rappa v. New Castle County, 18 F.3d 1043, 1070 (3d Cir. 1994) (confirming defendants' concession that "rights of way are an indistinguishable portion of the roads themselves", and stating that "[o]nce it is determined that the forum at issue is public

---

[1] Plaintiff offers Tobin v. Radnor Township Board of Commissioners, 597 A.2d 1258 (Pa. Commwth. 1991) in support of this contention. The Court declines to apply Tobin to its analysis of this matter, as Tobin is a distinguishable case dealing with issue of zoning and whether a street is public or paper under the Pennsylvania Municipalities Planning Code.

roads, it is clear that it is a public forum.)

This Court finds that Plaintiff's trespass argument is unlikely to succeed, as the facts at hand support a conclusion that the mulched area is a public forum, and not private property. The area of land in question in front of Adult World abuts Upper State Road, which is clearly a public street. Additionally, the mulched area displays characteristics of a public forum, despite not being a traditional, paved sidewalk. In the exhibits on record, a photo showing the mulched area depicts cut outs where a decline is present. (Doc. 13-2.) It is reasonable to deduce that these cutouts were intended so that the public could freely and safely use the mulched area, despite the lack of pavement. Moreover, Plaintiff admits that the mulched area constitutes a Township right of way. (TRO Hearing Transcript 3:3-20.) These facts lead this Court to conclude that the mulched area is likely to be deemed a right of way that constitutes a public forum where free speech is permissible.

Plaintiff argues that because the right of way was not paved in the same manner as a traditional sidewalk, it must not be considered a public forum. During the hearing, however, Plaintiff's witness, Adult World manager Mr. Harris, testified that police officers who came to Adult World in response to Mr. Harris' complaints about the protestors, instructed Defendants to use the mulched area because it is a right of way where the public may permissibly stand. (18:11-14.) This further substantiates the Court's finding that the mulched area used by Defendants indeed would likely be found a public, right of way where public use and free speech are allowable. As a result of the Court's finding, it is unnecessary for the Court to address Plaintiff's arguments concerning whether a private party may exercise their free speech rights on private

10

property.

　　　ii.　　Public Nuisance

Secondly, Plaintiff argues that it is likely to succeed on the merits of its state public nuisance claim. Plaintiff submits that "the general public has a right to safety and unfettered travel along Upper State Road", and that there is a "substantial risk of a protestor purposely or accidentally entering the lanes of traffic." Additionally, Plaintiff contends that this potential "interference with traffic poses a risk to other motorists." In support of its argument, Plaintiff cites Miller v. Upper Allen Twp., 535 A.2d 1195 (Pa. Cmwth. 1987) to support its position that it has standing to bring a claim for public nuisance. (Pl. Proposed Findings of Fact and Conclusions of Law, ¶¶ 121-124.) Defendant counters that Pennsylvania courts do not recognize a private cause of action for public nuisance[2], and that Miller does not establish such actions.

In Karpiak v. Russo, 676 A.2d 270, 272 (1996), the Superior Court of Pennsylvania affirms that in Pennsylvania, the standard for public nuisance is as follows: "a public nuisance does not exist unless a nuisance exists and affects the community at large and not merely the complaining parties."

The Court finds no Pennsylvania or Third Circuit authority recognizing a private cause of action, under facts analogous to those before us, for public nuisance.[3] Even if it were determined that Plaintiff has standing to bring a public nuisance claim under Pennsylvania law, it is unlikely that such a claim would succeed given the facts that no accidents or injuries have occurred over

---

[2] See Duquesne Light Co. V. Pa. Am. Water Co., 850 A.2d 701, 704 (Pa. Super. Ct. 2004).

[3] The Court notes that Miller deals with an entirely different issue than that presently before the Court. In Miller, the issue before the court was one of standing for appellants challenging a zoning decision under the Municipal Planning Code. Plaintiff cites no such code on which it relies to bring a public nuisance claim against Defendants.

11

the past five years as a result of Defendants' protest activities, and Defendants have stated that they do not feel unsafe or unstable on the mulched area, which makes it improbable that Defendants would accidentally enter lanes of traffic while protesting. (TRO Hearing Transcript 5:25; 6:1-3; 191:21-25; 192:1-2.) Even if the Court construes the facts in a light most favorable to Plaintiff, the obstructions caused by TKM protestors do not rise above the level of obstructions that a motorist might expect to encounter on a normal basis while driving along a high traffic roadway. Thus, the Court concludes that it is unlikely that Plaintiff will be successful concerning this claim.

### iii.     Private Nuisance

Third, Plaintiff submits that it is likely to prevail on its private nuisance claim against Defendants. In support of this contention, Plaintiff submits no authority, but claims that the actions of Defendants, including entering the high traffic Upper State Road, leaning into Upper State Road, Defendants' placement on the curbside, and in some circumstances, their presence on the mulched area, constitutes a nuisance through the obstruction of the view of business invitees, employees, and other authorized individuals. Additionally, Plaintiff argues that it has not accepted the risk that Defendants may sustain injuries in the future on Plaintiff's property during their protests.

Defendants argue that they may only be found liable for private nuisance if their actions are deemed to invade the Plaintiff's interest in the private use and enjoyment of its land, and to have caused significant harm to Plaintiff.

Karpiak cites the Restatement (Second) of Torts § 822, which provides the general rule followed by Pennsylvania courts concerning private nuisance:

12

> "One is subject to liability for a private nuisance if, but only if, his
> conduct is a legal cause of an invasion of another's interest in the
> private use and enjoyment of land, and the invasion is either
> (a) intentional and unreasonable, or
> (b) unintentional and otherwise actionable under the rules
> controlling liability for negligent or reckless conduct, or for
> abnormally dangerous conditions or activities. "

Id. at 272. Karpiak further states that the Restatement (Second) of Torts § 821(f) "indicates that

a defendant is not subject to liability for an invasion unless the invasion caused significant

harm." Id. The pertinent portion of Comment C to Section 821(f) defines "significant harm" as:

> "....harm of importance, involving more than slight inconvenience or petty
> annoyance. The law does not concern itself with trifles, and therefore there must
> be a real and appreciable invasion of the plaintiff's interests before he can have an
> action for either a public or private nuisance. . . . In the case of a private nuisance,
> there must be a real and appreciable interference with the plaintiff's use or
> enjoyment of his land before he can have a cause of action.

This Court finds it unlikely that Defendants' protesting in front of Adult World would be

found a private nuisance based on the above standard. While Defendants' protests are

undoubtedly intentional, protesting itself has not generally been found an unreasonable activity.

See Snyder v. Phelps, 131 S.Ct. 1207, 1220 (2011) (stating that protesting that "addressed

matters of public import on public property, in a peaceful manner, in full compliance with the

guidance of local officials" should be shielded "from tort liability.") Defendants have stated that

during their picketing, they do not block individuals from coming or going into or out of Adult

World, and do not purposely us their signs to obstruct motorists entering, exiting, or driving

along Upper State Road. (TRO Transcript 128:15-25; 129:1-5.) The message that Defendants

are promoting addresses matters of public concern in a peaceful way, and Defendants have

complied with the instructions of local police in confining their picketing to the right of way in

13

front of Adult World. Furthermore, Defendant Houck has testified that it is his practice to step back or move his signs whenever there is someone attempting to get around his sign. (TRO Hearing Transcript 172:1-4.) Lastly, Defendants have stated, and the photo exhibits on record support, that the mulched area is not dangerous and would be unlikely to cause unintentional injuries to be suffered by Defendants during protests in front of Adult World. (TRO Hearing Transcript 172:14.) The safe nature of the mulched area is further supported by the fact that local police officers have instructed TKM protestors to use this area on numerous occasions, and would not have done so if the area was unsafe and might cause injury to the protestors. For the above stated reasons, Plaintiff is unlikely to succeed on its private nuisance claim.

iv.    Violation/Suppression of Free Speech

To support its claim that its free speech rights have been violated by Defendants, Plaintiff points to the fact that First Amendment protects non-obscene adult entertainment, which is considered to be commercial speech. Additionally, Plaintiff argues that it is entitled to the right of free speech and expression under the Pennsylvania State Constitution, Article 1, Section 7. Plaintiff characterizes Defendants as "quasi state actors" because Defendants are allegedly "enjoying the failure of the police to enforce the law and preclude them from the decorative floral mulched areas." To counter, Defendants argue that Plaintiff does not have standing under the United States Constitution, nor under the Pennsylvania State Constitution, to assert violations of free speech rights, as these instruments are aimed at protecting persons from government intrusion of free speech.

The Court finds that Defendants' position is most accurate, and that under the law, Plaintiff will not likely have standing to assert a claim of free speech violations, as Defendants

14

will not likely be found governmental or quasi-governmental actors. There is nothing on the record to support Plaintiff's claim that Defendants are carrying out a quasi-governmental function by enjoying the failure of the local police to stop Defendants from protesting on the mulched area in front of Adult World. We have already noted above that the facts indicate that the mulched area is indeed a Township right of way, where Defendants may permissibly exercise their free speech rights by carrying on peaceful protests. Thus, the Court finds that Plaintiff will not likely succeed on its violation of free speech claim.

v.      Violation of the Sherman Anti-Trust Act

Plaintiffs submit that Defendants have violated the Sherman Anti-Trust Act, 15 U.S.C. § 1, et. seq. (the "Sherman Act"), by: (1) conspiring with each other and in concert to impose undue limitation on competitive conditions and have restricted competitive opportunity, and (2) conspiring to limit and eliminate the business of sexually explicit material entirely. Plaintiff, in support of its contention, cites the fact that Defendants have caused the closure of other unaffiliated adult businesses in Pennsylvania and other states.

Defendant argues that the Sherman Act was designed for the purpose of preventing "restraints of trade which [have] a significant effect on . . . competition." Sitkin Smelting & Refining Co. v. FMC Corp., 575 F.2d 440, 448 (3d Cir. 1978) (quoting Apex Hosiery Co. v. Leader, 310 U.S. 469. 493 n. 15 (1940)). The Court finds Sitkin instructive in this analysis, and notes that the Third Circuit states that when determining whether a plaintiff's burden has been met in a court's analysis of a Sherman Act claim, it "is clear, however, that plaintiffs have a burden to show more than a de minimus restraint."

To prove a violation of the Sherman Act, the following elements must be shown: (1)

15

conspiracy among the defendants; (2) with such conspiracy resulting in adverse, anti-competitive

effects within certain markets; (3) the objectives and conduct of the conspiracy are illegal; and

(4) injury to the plaintiff was proximately caused by the conspiracy. Martin B. Glauser Dodge

Co. v. Chrysler Corp., 570 F.2d 72, 81 (3d Cir. 1977). Only those actions which constitute an

unreasonable restraint of trade violate the Sherman Act. See Weiss v. York Hosp., 745 F.2d 786,

817 (3d Cir. 1984). Courts have found certain agreements and actions, such as price fixing,

division of markets, group boycotts, and tying arrangements, to be per se violative of the

Sherman Act. Id.at 818 (quoting Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5 (1958)

(citations omitted)). Where there no per se illegality exists, courts must the following "rule of

reason" to determine whether an agreement violates the Sherman Act:

> The true test of legality is whether the restraint imposed is
> such as merely regulates and perhaps thereby promotes
> competition or whether it is such as may suppress or even
> destroy competition. To determine that question the court
> must ordinarily consider the facts peculiar to the business to
> which the restraint is applied: its condition before and after
> the restraint was imposed; the nature of the restraint and its
> effect, actual or probable. The history of the restraint, the evil
> believed to exist, the reason for adopting the particular
> remedy, the purpose or end sought to be attained, are all
> relevant facts. This is not because a good intention will save
> an otherwise objectionable regulation or the reverse; but
> because knowledge of intent may help the court to interpret
> facts and to predict consequences.

Id. at 817 (quoting Board of Trade of City of Chicago v. United States, 246 U.S. 231, 238

(1918)). The Court finds that Plaintiff will not likely succeed on this claim, as Defendants'

organized protests and related activities do not likely rise to the level of restraint on competition

or an industry that is prohibited under the Sherman Act. Nowhere on the record does Plaintiff

16

provide facts supporting any actions taken by Defendants to impose a conspiracy to place undue limitations on competitive opportunities within the adult entertainment industry. Typically, cases where facts support a per se illegality under the Sherman act involve meddling with pricing structures, or other facets of the industry or business allegedly harmed. Here, there is no evidence of such actions taken by Defendants.

Similarly, Plaintiff's claim will likely fail under a rule of reason analysis, which is a highly fact specific inquiry. In the present matter, Plaintiff has suffered little harm, actual or probable, other than the unspecified losses of revenue that the store manager, Mr. Harris, attributed to Defendants' protests. (TRO Hearing Transcript 28:7-17.) The fact that Mr. Harris has only managed Adult World for a few months, since February 14, 2011, and Defendants have protested at the store for over five years, it makes it difficult to envision how Plaintiffs could succeed in showing that Defendants' actions over the past five years have caused them a level of harm rising to a Sherman Act violation. At most, the testimony of Mr. Harris provides information on Defendants' actions over less than a full calendar year. Moreover, Plaintiff has not specified the amount of revenues lost, nor any solid evidence showing that the protests were the actual cause of such losses. Notably, Plaintiff has not been forced to close its doors. Defendants have stated that their primary goal is to "create leaders" and that their "No More Porn Tour" is meant to preserve society, and not to result in some competitive benefit to TKM, a nonprofit organization with no financial stake in the adult entertainment business. (TRO Hearing Transcript 79:1-11.) Thus, the organized protests of Defendants will not likely be deemed a restraint of trade violative of the Sherman Act.

Lastly, courts have held that a plaintiff submitting a Sherman Act claim must show more

17

than the fact that Defendants merely sought to limit a plaintiff's business activities.[4] Northeast
Women's Center, Inc. v. McMonagle, 670 F.Supp. 1300, 1304 (3d Cir. 1987). Plaintiff supports
its Sherman Act claim by essentially stating that Defendants have sought to limit Plaintiff's
business in the same way that they allegedly caused the closure of other adult businesses. For the
aforementioned reasons, this Court finds it unlikely that Plaintiff will succeed on the merits of its
Sherman Act claim.

vi.    Violations of the Racketeer Influenced and Corrupt Organization (RICO) Act and Hobbs
       Act

Lastly, Plaintiff argues that it is likely to succeed on the merits of its civil RICO and
Hobbs Act claims.

RICO was enacted by Congress to eradicate organized crime in the United States, and
included a provision allowing private causes of action for injuries resulting from criminal
racketeering. Pub. L. 91-452, 84 Stat. 922, 23.

In order to state a civil RICO claim under 18 U.S.C. § 1962, a plaintiff must allege: "(1)
the conducting of, (2) an enterprise, (3) through a pattern, (4) of racketeering activity." Sedima,
S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). An enterprise, for purposes of the RICO Act,
"includes any individual, partnership, corporation, association, or other legal entity, and any
union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).
Plaintiff must show (1) the existence of an enterprise whose members function as a unit and that

_____

[4] In Northeast, the court states that "[t]he plaintiff has rested its claim for an antitrust recovery entirely on proof that the
defendants seek to destroy its abortion business. As this court forewarned the plaintiff on February 12, 1987, this proof alone is
not proof enough." This finding was in response to the Sherman Act claim set forth by, Plaintiff a women's clinic, against
Defendants, who were anti-abortion protestors staging demonstrations on and around the clinic's business location. Id. at 1302,
1304.

18

its existence is "separate and apart from the racketeering activity in which it engages", and (2) a pattern of racketeering activity comprised of the commission of at least two predicate acts of robbery or extortion within a ten-year period.  18 U.S.C. § 1964(c); 18 U.S.C. § 1961(5).  Under 18 U.S.C. § 1961(1), the definition of the term "racketeering activity" includes but is not limited to "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, [or] dealing in obscene matter."[5]

The Court finds that Plaintiff has not likely met its burden concerning its RICO claim, as Defendants' activities of peacefully organizing protestors in front of adult businesses cannot likely be characterized as "racketeering activity"as defined under 18 U.S.C. § 1961(5).

Similarly, the Court finds that Plaintiff will not likely succeed on the merits of its Hobbs Act claim.  Plaintiff provides little support for its Hobbs Act claim, stating that Defendants' protests against sexually explicit materials amount to Hohbs Act violations.

In order to satisfy the burden of proving a violation under the Hobbs Act, a plaintiff must show that the defendant undertook any of the following prohibited actions uuder18 U.S.C. § 1951(a):

> "...obstructs, delays, or affects commerce or the movement of any
> article or commodity in commerce, by robbery or extortion or
> attempts or conspires so to do, or commits or threatens physical
> violence to any person or property in furtherance of a plan or
> purpose to do anything in violation of this section...."

Defendants have stated that during their protests at and around Adult World, they have

---

[5] The Court notes that 18 U.S.C. § 1961(1) lists a bevy of additional crimes which qualify as racketeering activities, none of which are applicable to the facts in the present matter.

19

not used threats or force to induce any persons to part with property. (TRO Hearing Transcript 102:15-23; 103:1-11; 132:5-25, 133:1-2.) Nothing on the record supports that Defendants engaged in extortion or robbery, Thus, Plaintiff's Hobbs Act claim will not likely succeed.

## B.    Irreparable Harm to Plaintiff

The second factor required to be shown by Plaintiff in the preliminary injunction analysis is that of irreparable harm, which requires an imminent injury such that legal or equitable relief at the end of trial will not remedy the harm.

Plaintiff claims, and presented Mr Harris who testified, that Plaintiff will suffer and has suffered economic losses in the form of potential customers leaving the Adult World premises when confronted by protestors. Mr. Harris also testified that on the days of Defendants' protests "...revenues are usually down that day." (TRO Hearing Transcript 28:7-17.) Plaintiff points out that Defendants continues to utilize the mulched area in front of Adult World for protests, and occasionally crosses over onto Adult world's private property during TKM protests. Hearing Tr. 26:9-25; 27:1-7.)

The Third Circuit has reasoned that where "the record shows no more than a potential for purely economic injury" a plaintiff seeking injunctive relief will not have satisfied its burden of showing irreparable harm. See Acierno at 655. Moreover, if the plaintiff's alleged economic losses could be remedied if plaintiff is successful on his claims, the harm being complained of may not be characterized as irreparable. Id at 655. In this instance, it is unclear whether Plaintiff has sustained actual revenue losses caused by the Defendants' protests. Concerning Plaintiff's allegation of irreparable harm due to the Defendants' suppression of Plaintiff's right to freely exercise commercial speech, as stated in Acierno, if Plaintiff's

20

constitutional free speech rights are found to have been violated by Defendants, the harm to Plaintiff "can be remedied by an award of money damages."

Plaintiff also alleged that it is harmed by the potential liability of the unsafe conditions of the mulched area, and the risk of Defendants injuring themselves during protest activities. The record does not support this alleged safety hazard. Defendants have testified, as mentioned, that they are able to conduct their protest activities on and around Adult World in a safe fashion, and have done so for several years without injury or incident to themselves or others. (TRO Hearing Transcript 134:3-24.)

Given the alleged harms to Plaintiff, if found to be true, may be remedied if Plaintiff succeeds on its claims, the Court concludes that Plaintiff fails to meet its burden of showing unique, irreparable harm. We find, therefore, that this factors weighs in favor of Defendants.

**C.   Risk of Harm to Defendants**

In order to address a motion for injunctive relief, the Court must evaluate the third prong of the analysis for injunctions, and consider the potential harm to the nonmoving party. See Adams v. Freedom Forge Corp., 204 F.3d 475, 484 (3d Cir. Pa. 2000) (noting that "[i]f relevant, the court should also examine the likelihood of irreparable harm to the nonmoving party and whether the injunction serves the public interest.") Thus, the Court must examine whether Defendants will suffer irreparable harm if injunctive relief is granted.

Here, Plaintiff's pleadings are silent on the harms that would be suffered by Defendants should this Court order an injunction. Defendant correctly states that "The King's Men has a substantial First Amendment interest in continuing to effectively picket in public

21

rights of way....[a]n injunction that would limit their ability to do so would harm their First
Amendment freedoms." (Def. Proposed Findings of Fact and Conclusions of Law, 47-48.)

The First Amendment supports the foundational American principle that
democracy necessitates the free exchange of ideas and dialogue, and such exchanges should be
"uninhibited, robust and wide open." New York Times v. Sullivan, 376 U.S. 254, 270 (1964).
Freedom of speech activities are given great constitutional protection, particularly when such
protests are held in a traditional public forum. See Madsen v. Women's Health Center, 512 U.S.
753, 761 (1994). If this Court were to grant injunctive relief, the harm to Defendants' would be
great, as Defendants' fundamental free speech rights would be inhibited in a public forum,
namely the Township right of way in front of Adult World. Thus, the Court agrees with
Defendants' position, and finds that this factor of considering the harm to Defendants' weighs in
their favor.

**D.    Public Interest**

The Court finds that the fourth prong in the preliminary injunction analysis,
consideration of public interests, weighs in favor of Defendants. It is in the public interest to
promote freedom of speech, as guaranteed by the First Amendment. Additionally, the Court
notes that there are no incidents on record, such as vehicle accidents, arrests, or otherwise, in the
five plus years and over eighty (80) instances in which Defendants have protested at Plaintiff's
business, that necessitate the need for the Court to prohibit Defendants' protest activities due to
imminent public safety concerns. The Plaintiff's only witness, Mr. Harris, who started as store
manager of Adult World in February 2011, could only testify to the couple of instances of recent
protests that he witnessed in 2011. Based on this testimony, and the evidence presented at the

22

preliminary injunction hearing, it does not appear that facts support a finding in favor of granting injunctive relief to protect the public from Defendants' actions.

Moreover, the Court, in viewing video of Defendants' protests at Adult World at the hearing held in this matter, concludes that the obstruction to motorists exiting and entering the Adult World parking lot is no greater than ordinary obstructions such as trees or lamp poles that motorists must beware of on a normal basis. Mr. Harris' testimony supports this conclusions, as he stated at the preliminary injunction hearing that "...if you are pulling out into traffic on the upper part there, the left hand one, it's *hard* to see the traffic." (TRO Hearing Tr. 38:12-14.) (Emphasis added.) Mr. Harris stated that it was hard, but not impossible to see the oncoming traffic when pulling out of Adult World's parking lot when Defendants were present with their placards and signs.

Despite Mr. Harris' testimony that he saw cars swerving to avoid Defendants' placards which were placed into the flow of traffic, no such events were displayed on the videos presented before the Court at the hearing. (65:1-14.) Even if such concrete evidence of swerving were placed before the Court, it would not rise to the level of necessitating prohibition of protests, as cars must swerve during their normal course to avoid unexpected impediments in the road. Notably, Plaintiff's case was devoid of any evidence of police testimony concerning public safety concerns due to the protests, despite the fact that the local police had been contacted to intervene several times during Defendants' protests. Thus, based on the present record, the Court concludes that the public interest of protecting the fundamental free speech rights of Defendants outweighs the virtually non-existent public safety issues presented by permitting the protests to continue on the mulched right of way area in front of Adult World.

23

### E.    Time, Place, and Manner Restriction

Lastly, with respect to Plaintiff's proposed time, place and manner restriction, which would require Defendants to use only a small portion of sidewalk on the side of the Adult World building, the Court finds that the evidence on the record is insufficient to warrant the imposition of such a restriction on Defendants' free speech activities. In support of this finding, the Court relies upon the above discussion concerning its denial of Plaintiff's general request for injunctive relief.

### IV.                          CONCLUSION

Having determined that each of the four requisite factors of the preliminary injunction standard weigh against the Plaintiff, we find that injunctive relief is unwarranted in this case. Accordingly, this Court denies Plaintiff's Motion for a Temporary Restraining Order and Permanent Injunction. An appropriate Order will follow.

**BY THE COURT:**

**Hon. Petrese B. Tucker, U.S.D.J.**

24